## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

TONYA WARREN,

        Plaintiff,

vs.

U.S. BANK, N.A. (d/b/a U.S. BANK, U.S. BANCORP),

        Defendant.

Docket No. 2:26-cv-01257

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff, Tonya Warren, by and through her attorneys, Obermayer Rebmann Maxwell & Hippel LLP, files this Complaint against Defendant U.S. Bank, N.A. (d/b/a U.S. Bank, U.S. Bancorp)), and states as follows:

## INTRODUCTION

1.     Tonya Warren devoted more than two decades of her professional career to U.S. Bank, rising to become one of the only senior-level Black women in its Technology Services and Operations arm while consistently delivering exceptional results, serving as a subject-matter expert in managing complex, multimillion-dollar portfolios that were critical to the Bank's operations and profitability. Throughout her tenure, however, the Bank's management (who were predominantly White men) repeatedly applied common negative Black woman stereotypes to her, sidelined and underpaid her, skimming her incentive compensation by manipulating her performance evaluations while awarding higher compensation to her White male peers. They routinely excluded her from key opportunities she had earned through her performance.

1

Collectively, their actions cultivated and reinforced a work environment that was defiantly hostile to Warren as a Black woman.

2.　　In 2020, Warren informed the Bank's senior management of her disparate treatment. While they claimed to investigate her report of disparate treatment, and failed to protect her from further discrimination. Warren eventually made a formal written complaint with Human Resources ("HR") on May 23, 2025 revealing that the Bank's managers fostered a hostile work environment and were engaging in racial and gender-based discrimination, retaliation, and unethical conduct affecting customers and employees. In response, U.S. Bank did not protect her or meaningfully investigate her concerns. Instead, it shielded the White male managers she had identified, issued a terse "no finding" determination, maintained her in the same hostile reporting structure, and allowed the very managers she complained about to continue supervising her. Six months after her complaint, U.S. Bank fired Warren based on her race and/or sex and in retaliation for complaining about adverse treatment based on her race and/or sex, in violation of 42 U.S.C. §§ 1981, *et seq.*[1]  While U.S. Bank claimed that her position was eliminated, her job duties remained and the business she supported continues to expand to this day. Warren seeks damages, equitable remedies, declaratory relief, attorney fees, and litigation costs.

## JURISDICTION AND VENUE

3.　　Jurisdiction is proper over each of Warren's claims arising under the laws of the United States under 28 U.S.C. § 1331.

4.　　A substantial part of the actions, events, and omissions upon which Warren's claims are based occurred within Philadelphia, Pennsylvania.

---

[1] Warren has filed claims of race and sex discrimination, retaliation, and hostile work environment on the basis of race and sex with the U.S. Equal Employment Opportunity Commission and the Pennsylvania Human Relations Commission. She intends to amend this Complaint pursuant to Federal Rule of Civil Procedure 15 when these claims become ripe following completion of required administrative exhaustion.

2

5.    The Eastern District of Pennsylvania is the proper venue in which these claims should be litigated.

## PARTIES

6.    Warren is an adult individual residing in Philadelphia, Pennsylvania.

7.    Warren worked for U.S. Bank in Dealer Services and Technology Services and Operations for 22 years.

8.    U.S. Bank is a nationally chartered bank, headquartered at 800 Nicollet Mall BC-MN-4Pay Minneapolis, MN 55402-7020 and conducts businesses across the United States, including in Philadelphia, Pennsylvania, at 1735 Market Street Philadelphia, PA 19103 43rd floor.

9.    In 2024-2025, U.S. Bank's domestic workforce exceeded 70,000 employees.

## FACTS

10.    Warren is a Black woman who worked for U.S. Bank for approximately 22 years from June 2003 through her termination on November 19, 2025.

11.    Warren holds a Bachelors Degree from Howard University in Business Administration and Information Technology and a Masters of Business Administration and Management ("MBA") from Vanderbilt University and built her career in banking and technology services and operations, becoming a respected subject-matter expert and trusted steward of complex multi-million dollar financial portfolios.

12.    For most of her tenure at the Bank, Warren worked remotely. In 2024, Defendant required her in-person attendance at work after the COVID crisis. Thereafter, the hostility, scrutiny, and exclusion she experienced from Bank management escalated.

3

13.     Initially, Defendant hired Warren in 2003 to help develop the Project Management Office for Dealer Services (a $15 million business) under managers Tom Wirth and Chris Renn. She expanded that office from a single employee to a team of approximately 15 workers, strengthening and stabilizing a key revenue-generating function for the bank—which model continues to drive success in Dealer Services today.

14.     However, after relying on her expertise to construct the PMO model, Defendant allowed others, primarily White male managers, to later take credit for the very system Warren built, erasing her central role in creating an office that remains core to the Bank's operations.

15.     Over the years, the few promotions Warren received were self-initiated and driven by her own advocacy. For example, she authored a proposal requesting recognition and promotion for her work in building and developing the PMO office in Dealer Services and later sought the support of John Hyatt, President of Dealer Services, to transition to the Technology division after experiencing disparate treatment under a new manager.

16.     In 2016, Warren moved into Technology Services and Operations, including roles reporting to managers such as David Staloch and Marc Shepherd (2016-2018); Staloch and Executive Program Manager Sarah Beaudin (2019-2020); Paul Pereira and Merri Williamson (2021); Marc Shepard and Qasim Khan (2022 through February 2025); and April Pinder and Qasim Khan (February 2025 – Summer 2025).

17.     However, despite her performance, she plateaued, while her White male peers advanced.

18.     Over her two decades at U.S. Bank, Warren consistently performed at a high level and built and oversaw critical multi-million dollar portfolios. For example, she saved the Bank $1.3 million on the Corporate Payment Systems enhancements to the Bank's payment hub and saved the Bank $1.6 million on the Wires Platform Upgrade.

4

19.     She fought very hard to become the only senior-level Black woman in Defendant's Technology Services and Operations organization, all the while enduring stereotyping, exclusion, and dismissive treatment from senior management.

20.     In her Technology Services and Operations role, White and/or male leaders routinely siphoned Warren's expertise for their own advancement, stripping her name from her work and falsely representing her analyses as their own. This deliberate erasure of her contribution denied Warren visibility with key decision-makers and ensured that White male executives profited from her contributions, while she remained strategically indispensable but effectively invisible.

21.     Networking, sponsorship, and advancement at the Bank operated as a closed "Good Old Boys' Club" that systematically walled off Warren. White and/or male managers hoarded high profile opportunities, ostracizing Warren from travel, celebratory recognition events, and social forums directly tied to the portfolios she built and maintained. These intentional exclusions cut her off from mentors, relationship capital, and the informal endorsements that drive promotions. The message could not have been clearer: "Do all the work, but do not expect a seat at the table."

22.     Rather than correcting this discrimination, Defendant reinforced it by rewarding the very managers who marginalized Warren and maintained an entrenched, White male-centric culture that funneled White men into revenue-facing, career-accelerating roles. The cumulative impact was devastating: fewer sponsors, fewer visibility pathways, and fewer promotions for Warren despite her consistently stellar outcomes.

23.     Further, unlike similarly situated White and/or male peers, Warren routinely lost bonus money she earned; year after year, significant portions of her incentive compensation were reallocated to others, without negative performance reviews or any coherent explanation, demonstrating that Defendant treated her as less valuable because of her race and gender.

24.     When Warren asked senior manager David Staloch how she could consistently deliver high-impact results yet be deprived of her annual bonus, he responded that saving the bank money on her projects did not influence bonus awards.

25.     Warren then requested quarterly reviews to avoid end-of-year surprises during bonus evaluations but was told that only employees on corrective action plans received such reviews, signaling that she should not question decisions affecting her pay.

26.     In 2020, after years of hostile treatment and unexplained deprivation of bonuses and advancement opportunities, Warren escalated her concerns to the Bank's Chief Information Officer ("CIO"), Jeff von Gillern, telling him "I cannot breathe" and describing the discrimination and hostile environment she had been enduring.

27.     After purportedly investigating, von Gillern told Warren that he had confirmed everything she had reported and advised her not to sign reviews she did not agree with and to escalate her concerns in the future. Yet the discriminatory treatment persisted.

28.     Despite these obstacles, in or about December 2024, Warren received an 'exceptional' performance review from her then-manager, Marc Shepard, while managing a significant portfolio for senior manager Murali Arumugam and senior manager Bart Musil, further confirming that she was a top performer.

29.     In mid-2024, while still reporting to Marc Shepherd, Warren's responsibilities increased when a colleague went on maternity leave; Defendant required her to perform two jobs at once by continuing to manage the Murali Arumugam portfolio CRM/Salesforce and also taking on the nCino/Salesforce portfolio led by senior manager Bart Musil, without any corresponding increase in compensation or support.

4929-1605-8514 v1

30.    After Defendant assigned Warren to carry Musil's portfolio, she experienced a hostile and exclusionary culture under Musil. Senior manager Nate Coffelt and others marginalized her and used racially coded critiques, calling her "confusing," saying she "talks around issues" and "needs Toastmasters." They also labeled her self-advocacy as a Black woman in leadership as "aggressive" or "intimidating." Worse, they questioned whether she could even read or understand materials, a degrading attack on her literacy and intellect designed to stereotype and diminish her as a Black woman leader.

31.    Warren routinely carried the additional, uncompensated burden of educating White male managers on the most rudimentary financial principles governing large, complex portfolios – often scheduling and hosting meetings they ignored and refused to attend. She also prepared these managers for high stakes executive discussions only to be cast aside at the moment of presentation.

32.    Around that same period, Warren's stress intensified due to the cumulative impact of institutional racism and gender bias when undertaking these additional responsibilities without internal support. Her hypoparathyroidism, a stress-responsive medical condition, flared and ultimately required surgery in June 2024, yet Defendant did not address the discriminatory conditions contributing to her health decline and emotional distress.

33.    While still employed, Warren sought mental health counseling because of her stressful and discriminatory work environment.

34.    In October 2024, Defendant then formalized the arrangement that required Warren to perform two jobs by reorganizing her group so that the Arumugam portfolio she had managed since 2022, together with the nCino/Salesforce work she was already carrying, reported under

senior manager Musil, whose portfolio Warren had effectively been performing without appropriate support, title, or credit.

35.     The reorganization left Warren carrying both portfolios because her colleague Kelsey Sledge, who returned from maternity leave and could have shared the workload, was reassigned to cover the role of another White male employee, Mark Bosveld, who had a long history of performance concerns. Management knowingly retained Bosveld for a year despite his persistent performance problems until his termination in November 2025, the same month Warren was fired.

36.     Shortly thereafter, in February 2025, Warren's long-time supportive manager Marc Shephard retired, removing an important advocate.

37.     After Shephard's retirement, Defendant reassigned Warren to report to Qasim Khan and newly hired manager April Pinder, both of whom failed to hold a single one-on-one meeting with her, provide her with any performance feedback, or conduct a mid-year review in 2025, leaving her isolated and without guidance despite the size and importance of her portfolio.

38.     Around March or April 2025, Human Resources ("HR") contacted Warren and told her that someone was under investigation and that she "should know who it is" but refused to provide meaningful information or support. She later learned that HR was actually investigating her new manager, April Pinder.

39.     At the time HR approached her, Warren had only spoken to Pinder a couple of times and had nothing negative to report, yet HR used her as a witness in an investigation of her own manager without offering protections or acknowledging the risk of retaliation, particularly as a Black woman who had already raised internal concerns about disparate treatment in the past.

40.     When Pinder returned from leave following the investigation, Warren reported concerns to her about escalating mistreatment and ethical issues involving senior manager Musil, including derogatory comments he made about Warren's work and financial decisions that Warren believed were inconsistent with the Bank's standards and customer interests.

41.     Pinder informed Warren that Musil had been speaking disparagingly about her, and Warren's colleague, Heather Leonhardt and confirmed that Musil had made derogatory statements about Warren during a work trip, further demonstrating that a senior White male senior manager was undermining Warren's reputation behind her back.

42.     Warren also learned that Leonhardt herself had experienced disparate treatment from Musil, demonstrating that Warren's mistreatment was part of a broader pattern of hostility toward female leaders.

43.     When Warren told Pinder about Musil's conduct and her concerns about ethical irregularities in managing business finances, Pinder explicitly instructed Warren to put her concerns in writing– something Warren would not have done on her own, given her fear of retaliation and her lifetime experience in large corporate environments.

44.     At Pinder's direction, Warren submitted a formal HR complaint on or about May 23, 2025, describing discriminatory, retaliatory, and unethical conduct by senior management, Musil and Coffelt, and explaining that this was at least the second time she sought help from the company for disparate treatment.

45.     Warren chose not to proceed anonymously because she believed it was important to stand behind her concerns and because she trusted that Defendant would follow its own policies and protect her from retaliation, as required by law and internal policy.

46.    HR subsequently informed Warren that her complaint resulted in "no finding," further signaling that Defendant would shield senior management rather than redress discrimination against a long-tenured Black woman.

47.    In or about Summer 2025, April Pinder went out on leave and then separated from Defendant.

48.    However, Defendant failed to take meaningful steps to remove Warren from Musil's sphere of influence or to remediate the environment, leaving her exposed to the same management and culture she had identified as discriminatory.

49.    Warren told HR that this was the second time she requested help for disparate treatment without any relief, warning Defendant that next time, she would seek other help, thereby putting it on notice that she believed she was being subjected to racial discrimination and that its internal processes were failing her.

50.    In the months following the "no finding" determination, the atmosphere around Warren noticeably shifted. She observed that Musil and Coffelt appeared openly hostile toward her in meetings, exhibiting palpable tension that made collaboration difficult and reinforced her fear of retaliation.

51.    Warren also observed that management eventually stopped communicating with her altogether. Their inexplicable refusal to communicate with her became so severe that she was forced to funnel all communications through a single intermediary just to fulfill her responsibilities, a humiliating and destabilizing barrier no similarly situated White male peers faced that she was aware of.

52.    On November 19, 2025, at around 2:00-3:00 p.m., Khan abruptly sent Warren an instant message directing her to join a Zoom call.

53.    During a 5- to 10-minute video meeting with no HR representative present, Khan told Warren that "her position had been eliminated," effectively firing her. He gave her no other explanation for firing her. This was the only time Khan had ever participated in a meeting of any kind with Warren.

54.    Warren never had a meaningful conversation with Khan about her performance or responsibilities in 2025 nor had Khan met with her one-on-one to provide feedback or discuss any restructuring, yet he told her she was fired and to immediately hand in her laptop and phone to an administrator whose identity he did not even know.

55.    Defendant gave Warren no restructuring plan, no performance improvement plan, and no explanation as to how or why her position, alone, was being eliminated even though the nCino/Salesforce work she managed was not being eliminated, and was, in fact, expanding.

56.    Warren asked how many other employees were being terminated, but Khan could or would not answer.

57.    Later, Warren learned that the only other individual fired in close proximity to her was another employee with roughly seven years of service who, unlike Warren, had a record of performance and attendance problems—an isolated termination that did nothing to justify eliminating Warren's role.

58.    Most critically, Warren discovered that Defendant did not eliminate her role at all and instead installed a White male to take over her job duties.

59.    At the same time, a White senior manager under whom Warren worked missed more than 200 days of work per year and nevertheless remained in their senior-level role and retained status and benefits, underscoring that Defendant chose to discharge one of its longest-tenured Black women while retaining and favoring similarly situated White peers with weaker records.

11

60.     Defendant's severance paperwork informed Warren that her job elimination date would be January 9, 2026, but Warren refused to sign the release therein, asserting that her firing was discriminatory and retaliatory and felt that the severance package was being used to buy her silence about systemic discrimination, retaliation, and unethical practices at U.S. Bank.

61.     Warren's experience at U.S. Bank reflects more than a single adverse action; it embodied an extended pattern of institutional racism, sexism and hostility toward Black woman leaders, including the repeated skimming of bonuses, racially coded criticism of her communication style, and the Bank's refusal to substantiate her complaints while shielding senior managers who were White males, all of which caused her severe emotional distress and culminated in her discriminatory and retaliatory firing.

## CLAIMS FOR RELIEF

### COUNT I - Race discrimination under 42 U.S.C. §§ 1981, *et seq.*

62.     Warren incorporates by reference the foregoing paragraphs as if set forth fully herein.

63.     Under 42 U.S.C. § 1981, Defendant U.S. Bank was prohibited from taking adverse employment action against Warren because of her race, African-American.

64.     Warren was qualified for her position.

65.     In contrast to Warren's disparate treatment, a White senior manager under whom Warren worked missed more than 200 days per year and yet remained in her role and continued to receive senior-level status and benefits.

66.     On November 19, 2025, in violation of its obligation under 42 U.S.C. § 1981, Defendant fired Warren.

67.     The continued existence and expansion of the nCino/Salesforce business Warren supported, the more favorable treatment of White employees with weaker performance, and

12

Defendant's failure to address the discriminatory conduct Warren reported support a reasonable inference that Warren's race was the cause of Defendant's decision to fire her in violation of 42 U.S.C. § 1981.

68.     Defendant's violation of Section 1981 was willful.

69.     As a result of Defendant's willful violation of Section 1981, Warren suffered and will continue to suffer lost wages, lost benefits, and loss of career opportunities, as well as emotional pain, suffering, mental anguish, humiliation, loss of reputation, and loss of enjoyment of life.

## COUNT II - Retaliation under 42 U.S.C. §§ 1981, *et seq.*

70.     Warren incorporates by reference the foregoing paragraphs as if set forth fully herein.

71.     Under 42 U.S.C. § 1981, Defendant U.S. Bank was prohibited from retaliating against Warren for opposing race discrimination and complaining about race-based misconduct.

72.     In May 2025, Warren engaged in protected activity by submitting a detailed complaint of racial discrimination and related misconduct, including by submitting an ethics and HR report describing s racist, discriminatory, and demeaning conduct by senior management Bart Musil and Nate Coffelt, including racially insensitive comments, unequal treatment of employees from underrepresented groups, exclusion of those employees from key meetings, and a hostile work environment.

73.     Defendant was aware of Warren's protected complaints, issued "no finding" on her race-based concerns, took no meaningful corrective action against the senior management she had identified, and left her in the same hostile reporting structure while diminishing her compensation and opportunities.

74.     Following Warren's protected complaints, Defendant continued to preserve and favor the senior management who were White, diverted or reduced her incentive compensation while

comparably or less qualified White peers were treated more favorably, and ultimately fired
Warren without any justification on November 19, 2025, while the nCino/Salesforce business
she supported continued and expanded.

75.     The sequence of events following Warren's protected activity including Defendant's
refusal to remediate the discriminatory conduct she reported, its decision to protect the
management she criticized, its worsening treatment of her compensation and exclusion from
opportunities, and its decision to fire her while protecting the careers of the decision-makers she
complained about supports a reasonable inference that her protected complaints were the cause
of Defendant's decision to fire her in violation of 42 U.S.C. § 1981.

76.     Defendant's retaliatory violation of Section 1981 was willful because it acted with
knowledge of Warren's protected complaints and nevertheless chose to fire her rather than
address the misconduct she identified.

77.     As a result of Defendant's willful retaliation in violation of Section 1981, Warren
suffered and will continue to suffer lost wages, lost benefits, and loss of career opportunities, as
well as emotional pain, suffering, mental anguish, humiliation, loss of reputation, and loss of
enjoyment of life.

## COUNT III – Hostile Work Environment under 42 U.S.C. §§ 1981, *et seq*.

78.     Warren incorporates by reference the foregoing paragraphs as if set forth fully herein.

79.     Defendant subjected Warren to a racially hostile work environment in violation of 42
U.S.C. § 1981. The harassment and discrimination she endured were sufficiently severe or
pervasive that they altered the terms, conditions, and privileges of her employment and denied
her equal workplace opportunities and benefits.

80.    For Warren, the departments in which she worked became environments where exclusion, appropriation of her work, and race-coded attacks were routine features. Senior managers who controlled Warren's compensation, visibility, and advancement regularly undermined her authority, denied her access to essential communication channels, and created a climate in which she reasonably anticipated further marginalization every time she engaged with decision-makers.

81.    The environment detrimentally affected Warren personally, contributing to heightened stress and physical symptoms linked to that stress.

82.    Defendant's violation of Section 1981 was willful, as it acted or failed to act despite specific notice that Warren was experiencing a discriminatory hostile work environment, and it continued to protect or reward those responsible while compounding the harm to Warren..

83.    As a direct and proximate result of Defendant's unlawful conduct, Warren suffered damages including lost wages and benefits, loss of career opportunities, and significant emotional distress, mental anguish, reputational harm, and loss of enjoyment of life.

### COUNT IV – Sex-based Wage Discrimination in Violation of the Equal Pay Act under 29 U.S.C. § 206(d)

84.    Warren incorporates by reference the foregoing paragraphs as if set forth fully herein.

85.    Upon information and belief, Defendant skimmed and redistributed portions of Warren's bonuses to other employees, predominately male peers, in violation of the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d).

86.    The EPA prohibits an employer from paying wages, which includes bonuses, to an employee at a rate less than it pays to employees of the opposite sex for substantially equal work performed under similar working conditions on jobs requiring equal skill, effort, and responsibility, except where such payment is made pursuant to a seniority system, a merit

4929-1605-8514 v1

system, a system measuring earnings by quantity or quality of production, or a differential based on any factor other than sex.

87.    Warren is a woman who performed high-level program and portfolio leadership work requiring advanced education, significant experience, and specialized knowledge with responsibilities and deliverables that were substantially equal in skill, effort, and responsibility to those of male peers performing under similar working conditions.

88.    Despite performing substantially equal work, Defendant compensated male employees more than Warren through base compensation and/or variable compensation mechanisms, including incentive bonus and awards, and through related pay-affecting decisions that depressed Warren's total compensation relative to male comparators.

89.    Defendant's compensation practices were neither accidental nor benign; they operated to devalue Warren's work as a woman and to advantage male peers, including through opaque performance evaluation inputs and pay distribution processes that consistently yielded lower compensation to Warren than to similarly situated men.

90.    Defendant cannot credibly attribute the compensation disparities to any bona fide seniority system, merit system, production-based measure, or any factor other than sex. Instead, Defendant's pay practices strayed from neutral standards and functioned to entrench and legitimize the very sex-based inequities the Equal Pay Act forbids.

91.    Defendant's violations of the EPA were willful because it knew or showed reckless disregard for whether its compensation practices, including the diversion of portions of Warren's earned bonuses to male peers, unlawfully paid Warren less than male employees for substantially equal work.

16

92.    As a direct and proximate result of Defendant's unlawful conduct, Warren suffered

damages including lost wages and benefits, loss of career opportunities, and significant

emotional distress, mental anguish, reputational harm, and loss of enjoyment of life.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief:

    a.  Reinstatement;

    b.  Back pay/bonus earned from November 19, 2025, to date of judgment;

    c.  Front pay from date of judgment to a reasonable date in the future to compensate Warren for her lost earnings;

    d.  Lost benefits including medical coverage;

    e.  An amount equal to back pay for liquidated damages;

    f.  Compensatory and special damages for, including but not limited to, pain, suffering, inconvenience, mental anguish, emotional distress, loss of enjoyment of life, reputational damage, and other losses resulting from Defendant's above-described wrongful conduct toward Warren;

    g.  Punitive damages;

    h.  Pre and post-judgment interest;

    i.  Reasonable attorney's fees and costs;

    j.  Declaratory and injunctive relief; and

    k.  Any and all other relief that the Court deems just and proper.

                     Respectfully submitted,

4929-1605-8514 v1

*/s/Bruce C. Fox, Esquire*
Bruce C. Fox, Esquire
Pa. ID 42576
*bruce.fox@obermayer.com*
Andrew J. Horowitz, Esquire
Pa. ID 311949
*andrew.horowitz@obermayer.com*
Salena E. Moran (*pro hac vice* pending)
Pa. ID 334676
*salena.moran@obermayer.com*
OBERMAYER REBMANN
MAXWELL & HIPPEL LLP
525 William Penn Place, Ste. 1710
Pittsburgh, PA 15219
412-566-1500
412-281-1530 (f)

*Attorneys for Plaintiff*

Dated: February 26, 2026

4929-1605-8514 v1

## VERIFICATION

I, Tonya Warren, hereby certify subject to the penalties of perjury under the laws of the United States of America that the averments of facts contained in the within the Complaint are true and correct to the best of my knowledge, information, and belief.

Dated: _2/26/2026_

Signed by:

F0063BBE69D349F...

TONYA WARREN

4929-1605-8514 v1